| **SUMMONS AND ORDER OF NOTICE** | DOCKET NUMBER<br><br>**2083CV00627** | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|
| CASE NAME:<br>**Quinlan, John vs. Quad Graphics Inc.** | | Robert S. Creedon, Jr., Clerk of Courts |
| To:<br>**John Laughlin Fink, Esq.** | | COURT NAME & ADDRESS<br>Plymouth County Superior Court - Brockton<br>72 Belmont Street<br>Brockton, MA 02301 |

To the above named defendant(s):

You are hereby summoned and required to serve upon:

**John Laughlin Fink, Esq.**
**Sims and Sims**
**53 Arlington St**
**Brockton, MA 02301**

an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Brockton either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Preliminary Injunction has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

**Date:** 08/27/2020

**Time:** 02:00 PM

**Event:** Hearing on Preliminary Injunction

**Session Location:** Civil C /

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED | CHIEF JUSTICE OF THE SUPERIOR COURT<br>Witness: | ASSOCIATE JUSTICE | CLERK |
|---|---|---|---|
| **08/24/2020** | **Hon. Judith Fabricant** | **Hon. Valerie A Yarashus** | X |

| **RETURN OF SERVICE** |
|---|
| I hereby certify and return that on _____, I served a copy of this summons, together with a copy of the Complaint. |
| PARTY NAME:<br>X |

SCV027\ 04/2017

| SUMMONS AND ORDER OF NOTICE | DOCKET NUMBER<br><br>2083CV00627 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br><br>**Quinlan, John vs. Quad Graphics Inc.** | | Robert S. Creedon, Jr., Clerk of Courts |
| To:<br><br>**Quad Graphics Inc.** | | COURT NAME & ADDRESS<br><br>Plymouth County Superior Court - Brockton<br>72 Belmont Street<br>Brockton, MA 02301 |

To the above named defendant(s):

You are hereby summoned and required to serve upon:

> **John Laughlin Fink, Esq.**
> **Sims and Sims**
> **53 Arlington St**
> **Brockton, MA 02301**

an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Brockton either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Preliminary Injunction has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

Date: **08/27/2020**

Time: **02:00 PM**

Event: **Hearing on Preliminary Injunction**

Session Location: **Civil C /**

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED<br><br>**08/24/2020** | CHIEF JUSTICE OF THE SUPERIOR COURT<br>Witness:<br>**Hon. Judith Fabricant** | ASSOCIATE JUSTICE<br><br>**Hon. Valerie A Yarashus** | CLERK<br><br>X |
|---|---|---|---|

**RETURN OF SERVICE**

I hereby certify and return that on _____, I served a copy of this summons, together with a copy of the Complaint.

PARTY NAME:

X

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 2083CV00627 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Quinlan, John vs. Quad Graphics Inc. | Robert S. Creedon, Jr., Clerk of Courts |
|---|---|

| TO: John Laughlin Fink, Esq. Sims and Sims 53 Arlington St Brockton, MA 02301 | COURT NAME & ADDRESS Plymouth County Superior Court - Brockton 72 Belmont Street Brockton, MA 02301 |
|---|---|

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

#### STAGES OF LITIGATION     DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 11/23/2020 | |
| Response to the complaint filed (also see MRCP 12) | | 12/22/2020 | |
| All motions under MRCP 12, 19, and 20 | 12/22/2020 | 01/21/2021 | 02/22/2021 |
| All motions under MRCP 15 | 12/22/2020 | 01/21/2021 | 02/22/2021 |
| All discovery requests **and depositions** served and non-expert depositions completed | 06/21/2021 | | |
| All motions under MRCP 56 | 07/20/2021 | 08/19/2021 | |
| Final pre-trial conference held and/or firm trial date set | | | 12/17/2021 |
| Case shall be resolved and judgment shall issue by | | | 08/24/2022 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 08/24/2020 | ASSISTANT CLERK | PHONE |
|---|---|---|

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br><br>2083CV00627 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>Quinlan, John vs. Quad Graphics Inc. | Robert S. Creedon, Jr., Clerk of Courts |
|---|---|

| TO:  Quad Graphics Inc.<br>No addresses available<br><br>, | COURT NAME & ADDRESS<br>Plymouth County Superior Court - Brockton<br>72 Belmont Street<br>Brockton, MA 02301 |
|---|---|

## TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

**STAGES OF LITIGATION**                                       **DEADLINE**

|  | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court |  | 11/23/2020 |  |
| Response to the complaint filed (also see MRCP 12) |  | 12/22/2020 |  |
| All motions under MRCP 12, 19, and 20 | 12/22/2020 | 01/21/2021 | 02/22/2021 |
| All motions under MRCP 15 | 12/22/2020 | 01/21/2021 | 02/22/2021 |
| All discovery requests **and depositions** served and non-expert depositions completed | 06/21/2021 |  |  |
| All motions under MRCP 56 | 07/20/2021 | 08/19/2021 |  |
| Final pre-trial conference held and/or firm trial date set |  |  | 12/17/2021 |
| Case shall be resolved and judgment shall issue by |  |  | 08/24/2022 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED<br><br>**08/24/2020** | ASSISTANT CLERK | PHONE |
|---|---|---|

8·24·20

4

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

Plymouth Superior Court
Division of the Trial Court

JOHN QUINLAN
          Plaintiff,

v.

QUAD GRAPHICS INC.
          Defendants.

Civil Action Number: 2083CV00627C

**MOTION for SHORT ORDER of NOTICE**

Now comes the Plaintiffs and for their **MOTION for SHORT ORDER of NOTICE**,

hereby states:

The Plaintiff hereby requests that, in light of the claims raised by the Plaintiff, and based

upon the Plaintiffs' verified complaint, that this action determines the employability of the

Plaintiff in his chosen field, and that a short order is necessary to prevent loss of opportunity and

employment by the Plaintiff, that a short order of notice is reasonable and necessary in the above

case to adjudicate the Plaintiffs motions for injunction.

Dated: August 24, 2020

Respectfully submitted,
Plaintiffs
By their Attorney

John Fink BBO 683290
SIMS & SIMS, LLP
53 Arlington Street
Brockton, MA 02301
Tel. (508) 588-6900
Fax (508) 586-3320
E: johnfink@simsandsimsllp.com

FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

AUG 2 4 2020

Clerk of Court

8/24/20 (Yarashus, J) Allowed. Short order of notice to
issue returnable on 8/27/20 @ 2:00pm

Attest: Patrick (_____
att del

8·24·20

4

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                                    Plymouth Superior Court
                                                 Division of the Trial Court

JOHN QUINLAN
                Plaintiff,                       Civil Action Number: 2083CV00627 C
v.
                                                 **MOTION for SHORT ORDER of NOTICE**
QUAD GRAPHICS INC.
                Defendants.

Now comes the Plaintiffs and for their **MOTION for SHORT ORDER of NOTICE**,

hereby states:

The Plaintiff hereby requests that, in light of the claims raised by the Plaintiff, and based

upon the Plaintiffs' verified complaint, that this action determines the employability of the

Plaintiff in his chosen field, and that a short order is necessary to prevent loss of opportunity and

employment by the Plaintiff, that a short order of notice is reasonable and necessary in the above

case to adjudicate the Plaintiffs motions for injunction.

Dated: August 24, 2020                           Respectfully submitted,
                                                 Plaintiffs
                                                 By their Attorney

                                                 John Fink BBO 683290
                                                 SIMS & SIMS, LLP
                                                 53 Arlington Street
                                                 Brockton, MA 02301
                                                 Tel. (508) 588-6900
                                                 Fax (508) 586-3320
                                                 E: johnfink@simsandsimsllp.com

FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

AUG 24 2020

Clerk of Court

8/24/20 (Yarashus, J) Allowed. Short order of notice to
issue returnable on 8/27/20 @ 2:00pm

Attest: _____

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

PLAINTIFF(S): _John Quinlan_

ADDRESS: _Plymouth MA_

COUNTY _Plymouth_

DEFENDANT(S): _Quad Graphics Inc._

ATTORNEY: _John L. Fink_

ADDRESS: _53 Arlington St._
_Brockton MA 02301_

ADDRESS: _84 State St. Boston MA_

BBO: _683290_

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

CODE NO. _D03_

TYPE OF ACTION (specify) _Injunction- Employment Restrictive Covenant_

*If "Other" please describe:

TRACK _F_

HAS A JURY CLAIM BEEN MADE?
☒ YES          ☐ NO

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses .................................................................................................
    2. Total doctor expenses ...................................................................................................  $ _____
    3. Total chiropractic expenses ..........................................................................................  $ _____
    4. Total physical therapy expenses ..................................................................................  $ _____
    5. Total other expenses (describe below) .........................................................................  $ _____
    $ _____
    Subtotal (A):  $ _____
B. Documented lost wages and compensation to date ............................................................
C. Documented property damages to dated .........................................................................  $ _____
D. Reasonably anticipated future medical and hospital expenses ..........................................  $ _____
E. Reasonably anticipated lost wages .................................................................................  $ _____
F. Other documented items of damages (describe below) ......................................................  $ _____
    $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$ _____

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):
    _Unpaid wages_

TOTAL: $ _30,000_

Signature of Attorney/Pro Se Plaintiff: X _[signature]_

Date: _8/24_

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _[signature]_

Date:

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

Plymouth Superior Court
Division of the Trial Court

JOHN QUINLAN
                    Plaintiff,

v.

Civil Action Number:

QUAD GRAPHICS INC.

                    Defendants.

## Verified Complaint

1. John Quinlan is an individual who resides in Plymouth County, Massachusetts.

2. Quad Graphics Inc. (Quad) is a publicly traded company ($QUAD) with 21,100 employees as of 2017 with a registered agent for service of process of Corporate Service Company, 84 State Street, Boston, MA 02109.

3. Plaintiff began work for the Defendant Quad/Graphics on February 5th, 2014.

4. Plaintiff was initially hired as a Regional Sales Manager. See Exhibit A.

5. On June 18th 2020 Quad terminated the Plaintiff, along with many others, without cause.

6. Prior to his employment with Quad, Plaintiff ran his own factory in Woburn.

7. Plaintiff has had a major client at issue ("Client") as a client since 1994, well prior to his employment with Quad.

8. On February 5, 2014 the Plaintiff was presented with various documents to sign. One such document was the "Employment Letter Agreement" (Exhibit A).

9. Plaintiff was not given time to review the letter with counsel.

10. In 2017 the Defendants changed the Plaintiff's job title, duties and compensation to those of a Sales Employee from Regional Sales Manager.

11. Defendants placed the Plaintiff on a 100% commission plan.

12. At the time of the demotion the Defendants reduced commissions by changing the basis of calculation from gross to gross minus cost.

13. In 2018 the commission structure was altered further to alter commissions based on profit margins.

14. In 2019 Defendants reduced commissions by 2% across the board.

15. In February of 2020 Defendants again reduced commissions by 2%.

16. Plaintiff voluntarily reduced his draw in response to the reduction.

17. The agreement calls for a "Base Salary", a defined term, of $125,000.

18. On June 30th, 2020 the Plaintiff, through counsel, requested his personnel file as that term is understood by Massachusetts law.

19. Defendants acknowledged the request and affirmed they would work on it.

20. To date no file has been provided.

21. Plaintiff offered to sign a release but not additional covenants.

22. Defendant has refused to tender an agreement in conformity with the employment letter.


## Count I injunctive Relief

23. Plaintiff incorporates the above allegations.

24. Defendant has insisted that the restrictive covenants are enforceable.

25. Plaintiff is unable to pursue employment in his field while the Defendant's assert such claims.

26. Plaintiff seeks immediate consideration of the validity of the restrictive covenants in the complaint.

Wherefore, the Plaintiff requests that the Court

a) Issue its Summons and Order of Notice that Defendants answer this Verified Complaint and appear for a hearing on Plaintiff's Motion for a Preliminary Injunction on a short order of notice.

b) After a hearing, issue a preliminary injunction enjoining and restraining Defendants and their agents, servants, employees and attorneys from (a) seeking to enforce the restrictive covenants in the engagement letter.

c) After trial, enter a permanent injunction in the form as set out in Paragraph 2, above, and award Plaintiff his damages, attorneys' fees, costs and interest pursuant to Counts I through III of the Complaint. 5. Award Plaintiff such other relief as the Court may deem just and proper.

## Count II Failure to Provide Personnel File Pursuant to G.L. c. 149 §52C

27. Plaintiff incorporates the above allegations.

28. Plaintiff requested his personnel file on June 30th, 2020.

29. Defendant received and acknowledged the request.

30. Defendant to date has not provided the file.

Wherefore, Plaintiff demands an order directing that the Defendant hand over the file, damages as determined by the court, costs, and reasonable attorney's fees associated with obtaining his file.

## Count III Unpaid Wages

31. Plaintiff incorporates the above allegations.

32. Plaintiff's engagement letter called for certain benefits to be paid post-employment.

33. Plaintiff has complied with the agreement.

34. Plaintiff has offered to sign a release.

35. Defendants have not paid as agreed.

Wherefore, Plaintiff demands relief under the Wage Act of treble the money withheld, together with costs and reasonable attorney's fees. Plaintiff makes further demand in contract for damages as determined by the court, together with costs.

## VI.  **Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all counts so triable.

PLAINTIFF
By its attorneys,
SIMS & SIMS LLP

Dated:  Monday, August 24, 2020

John L. Fink (BBO# 683290)
53 Arlington Street
P.O. Box 7367
Brockton, MA 02303
(508) 588-6900
(508) 586-3320 (fax)
JohnFink@simsandsimsllp.com

## Verification

I, John Quinlan, Plaintiff in the above matter do hereby certify under the penalties and pains of perjury that I have read the foregoing verified complaint, that the facts stated therein are true, and that no material fact has been omitted therein.

dated: 8/24/2020

John Quinlan

EMPLOYMENT LETTER AGREEMENT

February 5 , 2014

John V. Quinlan
55 Cedar Street
Apt. 2309
Woburn, MA  01801

Dear Jack:

This letter agreement sets forth the terms and conditions of your employment by Quad/Graphics , Inc.("Quad" or the "Company") as a result of the closing of Quad's acquisition of UniGraphic, Inc.  This letter agreement will become effective only if the closing occurs.

1.    Employment.  You will be employed in the position of Regional Sales Manager, Commercial and Specialty.  You will report initially to Bob Quinlan, Sales Director, Commercial and Specialty.  You must devote your full business time, attention, skill and best efforts to the business and affairs of Quad.  You will have such duties, responsibility and requisite authority as are reasonably assigned to you from time to time by Monti or senior management.

2.    Compensation and Benefits.

(a) Base Salary.  You will receive an annual base salary of $125,000 ("Base Salary"), to be prorated for 2014.  Your Base Salary will be paid in equal weekly installments or in accordance with Quad's regular payroll practices as in effect from time to time.

(b) Sales Bonus 2014 and 2015.  You will be eligible to receive a sales bonus for the time period March 1, 2014 – February 28, 2015 ("2014 Bonus Year") and March 1, 2015 – February 29, 2016 ("2015 Bonus Year").  For purposes of the 2014 Sales Bonus ("2014 Sales Bonus"), should UniGraphic achieve a Total Revenue of $50 Million in the 2014 Bonus Year (as "Total Revenue" is defined by the Stock Purchase Agreement between Quad, you, and others), you will be eligible for a bonus of 25% of your 2014 Base Salary.  If UniGraphic's Total Revenue exceeds $50 Million by 5% or more for the 2014 Bonus Year, you will be eligible to receive a total bonus of 50% of your 2014 Base Salary.  To be eligible for this sales bonus you must remain in continuous full-time employment in good standing with the Company until the 2014 Sales Bonus is paid, which date shall be on or before May 15, 2015.

For purposes of the 2015 Sales Bonus ("2015 Sales Bonus"), should UniGraphic achieve a Total Revenue of $53 Million in the 2015 Bonus Year, you will be eligible for a bonus of 15% of your 2015 Base Salary.  If UniGraphic's Total Revenue exceeds $53 Million by 5% or more for the 2015 Bonus Year, you will be eligible to receive a total bonus of 30% of your 2015 Base Salary.  To be eligible for this sales bonus you must remain in continuous full-time employment in good standing with the Company until the 2015 Sales Bonus is paid, which date shall be on or before May 15, 2016.

This Sales Bonus will apply for the time periods set forth above only unless otherwise mutually agreed to in writing.

      (c) <u>Draw Against Commissions</u>. For calendar years 2014 and 2015 only, you will receive a guaranteed draw against commissions in the amount of $70,000, to be prorated for 2014. Earned commissions will be offset against this draw up to $70,000 in each such year.

      (d) <u>Equity</u>.   In calendar year 2014, you shall receive a grant of restricted stock in accordance with the 2014 Restricted Stock Award document and pursuant to the terms of that document and the applicable plan and plan document(s). Your grant shall be that number of shares which, at the time of the grant according to the approved fair market valuation methodology, would have a value of $75,000.

      In calendar year 2015, you shall receive a grant of restricted stock in accordance with the 2015 Restricted Stock Award document and pursuant to the terms of that document and the applicable plan and plan document(s). Your grant shall be that number of shares which, at the time of the grant according to the approved fair market valuation methodology, would have a value of $60,000.

      (e) <u>Vacation</u>. You will be granted four (4) weeks of vacation each year until an increase would be otherwise allotted according to the Quad Employee Guidelines.

      (f) <u>Other Benefits</u>. You will be entitled to participate in the benefits arrangements provided by the Company to its similarly-situated employees at your location, as described in the Quad Employee Guidelines, and subject to the terms and conditions of such plans or other benefits arrangements, as amended from time to time, and to your meeting the eligibility requirements for such arrangements.

      (g) <u>Tax Withholding</u>. Quad will deduct from the payments to be made to you under this agreement any federal, state or local income and employment tax withholding or other taxes or charges which it is from time to time required to deduct under applicable law with respect to such payments or any other benefits provided hereunder, and all amounts or percentages payable to you under this agreement are stated before any such deduction.

      3.    <u>Termination of Employment</u>.

      (a)    <u>At-Will Employment</u>. You acknowledge and agree that, notwithstanding anything to the contrary in this agreement, you are employed at will. This agreement is not intended and should not be construed as a contract for any term of employment. By signing this agreement, you acknowledge that your employment, compensation and benefits may change from time to time and are for no definite period of time. The Company may terminate your employment and this agreement, at any time, with or without Cause (as defined below), without further obligation on the part of the Company, except as provided in Section 3(b), or you may resign from employment without further obligation under this agreement, except as provided in Section 4.

      (b)    <u>Payment on Termination</u>.

      (i)    Notwithstanding anything in this Agreement, if Quad terminates your employment without Cause at any time prior to or on June 30, 2015, then you shall receive

any unpaid 2014 Base Salary (prorated solely to account for Start Date) and any unpaid 2015 Base Salary, paid in accordance with the above provisions of this Agreement.

(ii)     In addition to (i) above, notwithstanding anything in this Agreement, if Quad terminates your employment without Cause at any time prior to or on May 15, 2016, then you shall receive any unpaid 2014 Sales Bonus (at 25% of full 2014 Base Salary) and any unpaid 2015 Sales Bonus (at 15% of 2015 Base Salary). The only exceptions to this paragraph are as follows and to the extent a Sales Bonus is unpaid at the time of termination: (A) if you worked through February 28, 2015 or February 29, 2016 and UniGraphic did not achieve Total Revenue required for the 2014 Bonus Year or the 2015 Bonus Year, respectively, in which case the applicable Sales Bonus will not be paid; and (B) if you worked through February 28, 2015 and UniGraphic's Total Revenue exceeds $50 Million by 5% or more in the 2014 Bonus Year, in which case you will be paid a total bonus of 50% of your Base Salary for the 2014 Bonus Year; and (C) if you worked through February 29, 2016 and UniGraphic's Total Revenue exceeds $53 Million by 5% or more in the 2015 Bonus Year, in which case you will be paid a total bonus of 30% of your Base Salary for the 2015 Bonus Year.

(iii)     In addition to (i) and (ii) above, notwithstanding anything in this Agreement, if Quad terminates your employment without Cause at any time prior to or on March 15, 2016, then you shall receive any unpaid 2014 and 2015 Draws Against Commissions as set forth in section 2(c) and prorated for 2014 solely to account for start date.

(iv)     If Quad terminates your employment without Cause at any time after June 30, 2015, then you will receive continued payments of six (6) months' worth of your base salary in approximately equal installments for six (6) months following your termination date paid in accordance with the regular payroll practices of the Company.

(v)     If Quad terminates your employment without Cause at any time, and if either of the equity grants described in 2(d) above have not vested at the time of your termination, you will be paid $75,000 for the 2014 grant and/or $60,000 for the 2015 grant in a lump sum in place of such unvested equity.

(vi)     You will be entitled to the payments under (i)-(v) above only if you provide a release of claims in a form acceptable to the Company within 45 days following your termination of employment and do not revoke such release and only if you comply with the obligations set forth in Section 4 of this agreement. If Quad terminates your employment without Cause but subsequently determines that your employment could have been terminated for Cause, then (without limitation of other remedies) no further such payments will be made. For purposes hereof, "Cause" means your (i) commission of a felony involving dishonesty or fraud with respect to the Company, (ii) material failure to perform duties (other than as a result of your disability) of the position held by you as directed by the senior management of the Company, (iii) willful misconduct with respect to the Company, or (iv) any material breach by you of the terms of this agreement or any other agreement with the Company. For the avoidance of doubt, the termination of your employment as a result or your death or disability will not be considered a termination without Cause.

4.     Covenants. In consideration of the promises made by the Company hereunder, you agree to each the following:

3

(a)     Definitions.

(i)     Business.  The term "Business" means custom and/or specialty printing of books, brochures, catalogs, calendars, direct mail, directories, point-of-purchase, displays, in-store signage, fulfillment and print-on-demand services.

(ii)     Business Ideas.  The term "Business Ideas" means all ideas, inventions, data, software, developments and copyrightable works, whether or not patentable or registrable, which you originate, discover or develop, either alone or jointly with others while you are employed by the Company entity and for 12 months thereafter and which are (A) related to any business known by you to be engaged in or contemplated by the Company, (B) originated, discovered or developed during your working hours or (C) originated, discovered or developed in whole or in part using materials, labor, facilities, Confidential Information, Trade Secrets, or equipment furnished by the Company.

(iii)     Competitor.  The term "Competitor" means any Person that, at the time of your termination, competes with the Business, including, but not limited to, Pearl Die-Cutting and Finishing.

(iv)     Confidential Information.  The term "Confidential Information" means all non-Trade Secret information of, about or related to the Company or provided to the Company by its customers that is not known generally to the public or the Company's competitors.  Confidential Information includes, but is not limited to: (A) inventions, product methodologies and specifications, information about goods, products or services under development, research, development or business plans, procedures, survey results, pricing or other financial information, confidential reports, handbooks, customer lists and contact information, information about orders from and transactions with customers, sales, marketing and acquisition strategies and plans, pricing strategies, information relating to sources of data used in goods, products and services, computer programs, computer system documentation, production manuals, operations books, educational materials, audio, visual or electronic recordings, customer communications, customer contracts, training materials, personnel information,  business records, or any other materials or technical methods/processes developed, owned or controlled by the Company; (B) information and materials provided by a customer or acquired from a customer; and (C) information marked or otherwise designated or treated as confidential or proprietary by the Company.  The fact that the Company has not labeled a document or other material "Confidential" shall not be deemed a waiver of its right to claim that said document or material is Confidential Information.

(v)     Reference Period.  The term "Reference Period" means the 12 months preceding the end, for whatever reason, of your employment with the Company.

(vi)     Restricted Customer.  The term "Restricted Customer" means any individual or entity: (A) for whom/which the Company has provided goods, products or services; and (B) with whom/which you had direct contact on behalf of the Company, or about whom/which you acquired confidential information in connection with your employment by the Company, during the Reference Period.

4

(vii)   <u>Restricted Services</u>. The term "Restricted Services" means duties, functions and services of the kind you provided to the Company during the Reference Period relating to the Business.

(viii)   <u>Trade Secret</u>. The term "Trade Secret" has the meaning set forth under applicable law.

(b)   <u>Confidentiality</u>. During the term of your employment, you will not directly or indirectly use or disclose any Confidential Information or Trade Secret of the Company except in the interest and for the benefit of the Company. After the end, for whatever reason, of your employment with the Company, you will not directly or indirectly use or disclose any Trade Secret of the Company. For a period of 24 months following the end, for whatever reason, of your employment with the Company, you will not directly or indirectly use or disclose any Confidential Information. Notwithstanding the foregoing, (i) the terms "Trade Secret" and "Confidential Information" do not include, and the obligations set forth in this agreement do not apply to, any information which (A) is or becomes generally available to the public through no act or omission of yours or (B) is independently developed by you outside the scope of your employment without use of Confidential Information or Trade Secrets; and (ii) you may disclose Confidential Information or Trade Secrets at such times, in such manner and to the extent such disclosure is required by applicable law, provided that you (1) provide the Company with prior written notice thereof, (2) limit such disclosure to what is strictly required and (3) attempt to preserve the confidentiality of any Confidential Information or Trade Secrets so disclosed.

(c)   <u>Assignment of Business Ideas</u>. You represent that you do not personally own an interest in any inventions, patents, applications for patent, copyrights, and applications for copyright. The Company will own, and you hereby assign to the Company, all rights in all Business Ideas. All Business Ideas which are or form the basis for copyrightable works shall be considered "works for hire" as that term is defined by U.S. Copyright Law. Any works that are not found to be "works for hire" are hereby assigned to the Company. While employed by the Company and thereafter, you will promptly disclose all Business Ideas to the Company and execute all documents which the Company may reasonably require to perfect its patent, copyright and other rights to such Business Ideas throughout the world. After your employment with the Company terminates, for whatever reason, you will cooperate with the Company to assist the Company in perfecting its rights to any Business Ideas including executing all documents which are required in order to perfect such rights.

(d) <u>Restrictions on Competition During Employment</u>. During the term of your employment with the Company, you will not (i) directly or indirectly compete against the Company, or directly or indirectly divert or attempt to divert customers' business from the Company anywhere the Company does business, including but not limited to acting in any manner on behalf of or for the benefit of Pearl Die-Cutting and Finishing, or increasing your ownership interest in Pearl Die-Cutting and Finishing; or (ii) engage in any related party transactions (including with Pearl Die-Cutting and Finishing) without prior approval from the President of Commercial & Specialty or the Director of Purchasing of the Company. .

(e) <u>Post-Employment Restricted Services Obligation</u>. For 18 months following the end, for whatever reason, of your employment with the Company, you agree not to directly or indirectly provide Restricted Services to any Competitor.

5

(f) <u>Post-Employment Non-Solicitation of Restricted Customers</u>. For 18 months following the end, for whatever reason, of your employment with the Company, you agree not to directly or indirectly sell or attempt to sell to any Restricted Customer any goods, products or services of the type you directly or indirectly sold, marketed, produced or provided during the Reference Period.

(g) <u>Post-Employment Non-Solicitation of Employees</u>. During the term of your employment with the Company and for 18 months thereafter, you shall not directly or indirectly encourage any Company employee to terminate or diminish their employment with the Company.

(h) <u>Acknowledgement</u>. You acknowledge and agree that the Company does business and sells and distributes its goods, products and services throughout the United States and, that, given the nature of the business of the Company and your role with the Company, the duration, geographic scope and activity restrictions of this Section 4 are reasonable and will not prevent you from earning a living.

(i) <u>Survival</u>. The covenants set forth in this Section 4 shall survive the termination, for whatever reason, of your employment hereunder.

5.      <u>Miscellaneous</u>.

(a) <u>Benefits and Obligations</u>. This agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by the Company and its successors and assigns, and you, your heirs, assigns or legal representatives, provided that your obligations contained herein may not be delegated or assigned.

(b) <u>Offset</u>. The Company shall have the right to offset from the amounts payable to you hereunder any amount that you owe to the Company without obtaining your consent at such time (or following your death, the consent of your spouse or personal representative of your estate).

(c) <u>Specific Performance</u>. In the event of any controversy concerning the rights or obligations under this agreement, such rights or obligations will be enforceable in a court of equity by a decree of specific performance. Such remedy, however, will be cumulative and nonexclusive and will be in addition to any other remedy to which the parties may be entitled. You shall pay the Company's costs of enforcing any of the provisions of Section 4, including reasonable attorneys' fees.

(d) <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, void, or unenforceable to any extent, such term or provision shall be construed so as to give it the maximum effect permitted by law. Should any provision, or any part of any provision, of this Agreement be held to be invalid or unenforceable, such validity or unenforceability shall not affect the validity or enforceability of any other provisions or other part of such provision, or of such provisions or part thereof.

(e) <u>Waiver</u>. The failure of any party hereto to insist, in any one or more instances, upon performance of any of the terms and conditions of this letter, shall not be construed as a waiver or relinquishment of any right granted hereunder or of the future performance of any such term, covenant or condition.

(f) <u>Governing Laws</u>. This agreement shall be governed by and construed in accordance with the laws of the State of Massachusetts, without reference to the conflict of law principles thereof.

(g) <u>Venue</u>. Milwaukee County, WI shall be the exclusive venue for disputes arising under this agreement, and the parties consent to the exclusive jurisdiction and proper venue of, any state or federal court located in Milwaukee County, Wisconsin.

(h) <u>Subsequent Employment</u>. You agree that the Company may notify any other employer you may have or any other third party about your obligations under this agreement until such time as you have performed all of your obligations hereunder. Upon the Company's request, you agree to provide the Company with information, including, but not limited to, supply details of your subsequent employment, sufficient to verify that you have not or are not breaching any covenant of this agreement.

(i) <u>Entire Agreement</u>. This agreement supersedes all prior agreements between the parties (including any agreement with UniGraphic prior to the Company's acquisition of UniGraphic) and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. In addition, you acknowledge that any previous employment agreements with UniGraphic were terminated prior to entering this Agreement and that no additional amounts are owed to you thereunder.

(j) <u>Voluntary Agreement</u>. You acknowledge and agree that you have carefully read this agreement, understand it contents, have been given the opportunity to ask any questions concerning the letter and its contents, and have agreed to the terms and conditions hereof as your free and voluntary act.

Sincerely,

QUAD/GRAPHICS, INC.

BY _____

Please sign below to signify your understanding and acceptance of the terms and conditions of this agreement, including your agreement to be bound by the provisions of Section 4.

_____
John V. Quinlan

Date: _____2/5/14_____

7

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH

Plymouth Superior Court
Division of the Trial Court

JOHN QUINLAN
　　　　　　　Plaintiff,

v.

QUAD GRAPHICS INC.
　　　　　　　Defendants.

Civil Action Number:

**MOTION FOR PRELIMINARY INJUNCTION**

　　　　Pursuant to Mass.R.Civ.P. 65(b), Plaintiff, John Quinlan moves for a preliminary injunction against the Defendant, Quad Graphics Inc. that will enjoin, restrain, and order their agents, servants, employees, and attorneys as follows:

1. Enter an order preventing the Defendants from enforcing the restrictive covenants contained in their initial engagement letter with the Plaintiff.

2. Enter a finding that the Plaintiff is not bound by the restrictive covenants against his former employer.

3. Find and Rule that Quad's restrictive covenants are unlawful and against public policy.

Dated: Monday, August 24, 2020

Respectfully submitted,
Plaintiff
John Quinlan

John Fink BBO 683290
SIMS & SIMS, LLP
53 Arlington Street
Brockton, MA 02301
Tel. (508) 588-6900
Fax (508) 586-3320
E: johnfink@simsandsimsllp.com

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

Plymouth Superior Court
Division of the Trial Court

JOHN QUINLAN
                Plaintiff,
v.

Civil Action Number:

**MOTION for SHORT ORDER of NOTICE**

QUAD GRAPHICS INC.
                Defendants.

Now comes the Plaintiffs and for their **MOTION for SHORT ORDER of NOTICE**,
hereby states:

The Plaintiff hereby requests that, in light of the claims raised by the Plaintiff, and based
upon the Plaintiffs' verified complaint, that this action determines the employability of the
Plaintiff in his chosen field, and that a short order is necessary to prevent loss of opportunity and
employment by the Plaintiff, that a short order of notice is reasonable and necessary in the above
case to adjudicate the Plaintiffs motions for injunction.

Dated: August 24, 2020

Respectfully submitted,
Plaintiffs
By their Attorney

John Fink BBO 683290
SIMS & SIMS, LLP
53 Arlington Street
Brockton, MA 02301
Tel. (508) 588-6900
Fax (508) 586-3320
E: johnfink@simsandsimsllp.com

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH

SUPERIOR COURT DEPARTMENT
PLYMOUTH DIVISION
DOCKET NO.

John Quinlan
        Plaintiff

v.

Quad/Graphics Inc.
        Defendant

## PLAINTIFF'S  MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

"Reluctance to give full effect to post-employment restraints has a long history in the law. For example, in 1587, a blacksmith was jailed by local justices of the peace when he had the temerity to bring an action against another blacksmith's (thought to have been an apprentice) bond not to ply his trade in the town of South-Mims."[1]

### Facts

Plaintiff began work for the Defendant Quad/Graphics on February 5th, 2014 as a Regional Sales Manager. Quad Graphics is a publicly traded company (QUAD) with 21,100 employees as of 2017.  Prior to his employment with Quad, Plaintiff ran his own factory in Woburn. Plaintiff has had TJX as a client since 1994, well prior to his employment with Quad.

On February 5, 2014 the Plaintiff was presented with various documents to sign. One such document was the "Employment Letter Agreement" being the subject of this litigation. Plaintiff was not afforded the opportunity to review with counsel. The agreement calls for a "Base Salary", a defined term, of $125,000.

---

[1] *Kroeger v. Stop & Shop* 13 Mass. App. Ct. 310, 313-314 (1982)

In 2017 the Defendants changed the Plaintiff's job title, then a Regional Sales Manager (as contemplated in the offer of employment), duties, and compensation to those of a Sales Employee. Defendants placed the Plaintiff on a 100% commission plan. At the same time the Defendants reduced commissions by changing the basis of calculation from gross to gross minus cost. In 2018 the commission structure was altered further to alter commissions based on profit margins. In 2019 Defendants cut commissions by 2% across the board.  Defendants slashed commissions by 2% again  in February of 2020.

As a result of the commission slash the Plaintiff voluntarily reduced his "draw" from commissions, in part to help the company. Defendants have consequently attempted to pay the Plaintiff less severance as a result of his voluntary reduction, not in compensation, but in draw.

On June 18th 2020 Quad terminated the Plaintiff, along with many others, without cause.


## Representations of Counsel

On June 30th, 2020 the Plaintiff, through counsel, requested his personnel file as that term is understood by Massachusetts law. Defendants acknowledged the request and affirmed they would work on it. To date no file has been provided.  On July second, the undersigned spoke with Alex Pyke, a designee for labor issues of the Defendant regarding the request and the inaccurate calculation of the severance offered to the Plaintiff. No change to the payment was offered.  On 7/30 the same issue regarding compensation calculation was discussed via teleconference with Stephen Melnick from Littler. Over a week later Melnick informed the Plaintiff's counsel no change to amount would be forthcoming.

## **Standard**

Preliminary Injunction

The requirements for preliminary injunctive relief in Massachusetts are well established. The court must consider the following three factors:

- the plaintiff's likelihood of success on the merits,
- the risk of irreparable harm to the plaintiff if the injunction is not issued, and
- the irreparable harm to be suffered by the defendant if the injunction is issued.

*Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980).

Massachusetts courts employ a "balancing" test in evaluating these factors. If failure to issue the injunction would subject the plaintiff to the substantial risk of irreparable harm, the court must then balance this risk against any similar risk of harm that granting the injunction would create for the defendant. *Packaging Indus. Group v. Cheney*, 380 Mass. at 617. As the Supreme Judicial Court has explained: "What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's success on the merits." *Packaging Indus. Group v. Cheney*, 380 Mass. at 617.

Restrictive Covenants

A restrictive covenant between an employer and an employee may be enforced where the employer can show that the agreement is: (1) necessary to protect a legitimate business interest of the employer; (2) supported by consideration; (3) reasonably limited in all circumstances including time and space; and (4) otherwise consonant with public policy. *All Stainless, Inc, v. Colby*, 364 Mass. 773, 777-78 (1974).

## Point One:   The Employer Unilaterally Changed the Employment Agreement without Resigning the Restrictive covenants, Voiding the Agreement

In 2017 Quad changed the Plaintiff's job title and responsibilities from Regional Sales Manager to just Sales. At the same time Quad changed the Plaintiff's pay by reducing commissions by "costs. " Courts have held similar changes to remove the restrictive covenants.

"It is well-settled under Massachusetts law that each time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed." *Iron Mountain,* 455 F.Sup.2d at 132–33. "[F]ar reaching changes [in an employment relationship] strongly suggest that the parties had abandoned their old arrangement and had entered into a new relationship." *F.A. Bartlett Tree Experts v. Barrington,* 353 Mass. 585, 587–88 (1968). Relying on *F.A. Bartlett,* several Superior Court decisions have reached the same conclusion. See *Lycos, Inc. v. Jackson,* 18 Mass. L. Rptr. 256, 2004 WL 2341335, at 3-4 (Mass.Super.Ct. August 25, 2004) (Houston, J.); *Cypress Group, Inc. v. Stride & Assocs., Inc.,* 17 Mass. L. Rptr. 436, 2004 WL 616302 (Mass.Super.Ct. February 11, 2004) (Burnes, J.); *Intertek Testing Servs. N.A., Inc. v. Curtis Strauss, LLC,* 2000 WL 1473126 at *6 (Mass.Super.Ct. August 8, 2000) (Gants, J.). See also *ABC Cable Sys., Inc. v. Clisham,* 62 F.Sup.2d 167, 173 (D.Mass.1999) (applying Massachusetts law). "Massachusetts courts have consistently refused to grant injunctive relief or otherwise enforce restrictive covenants where such covenants were entered prior to changes in the employment relationship." *Iron Mountain,* 455 F.Sup.2d at 133, citing *Lycos, Inc.,* 2004 Mass.Super. LEXIS 348, at *10.

Courts have similarly held where sales agreements and pay structures were altered, the employee was released from the restrictive covenant. See e.g. *Lantor Inc. v. Ellis Neptco, Inc., No,* No. 98-01064 (Mass. Cmmw. Oct. 2, 1998) stating "find that Lantor committed a material breach

of its employment agreement with Ellis in 1996 when it unilaterally changed the terms of employment by imposing a new bonus scheme and reserving the right to modify this and any future bonus scheme without limitation. ... As a result of Lantor's material breach of the employment agreement in 1996, <u>Ellis was discharged from his obligations under that agreement, including his obligation not to compete with Lantor after leaving its employ</u>." (emphasis added).   A similar holding and result occurred in *Karns v. Folio Exhibits, Inc., No*, No. 020367 (Mass. Cmmw. Mar. 12, 2002) "There is a likelihood that the moving party will not be successful after a full hearing on the merits. The counterclaim defendant contends that Folio breached their agreement first by announcing a unilateral change in the commission structure by not only reducing the commission rate but also imposing a sales quota, contrary to the letter agreement, his understanding and his intent regarding his employment with Folio being conditioned upon his receipt of a flat guaranteed commission rate without being subject to a sales quota, <u>thus excusing him from his obligations under the contract</u>."

In addition to the demotion, the Defendants have continually altered the compensation structure and plans available to the Plaintiff. The commissions were reworked no less than 3 times in the past three years, two of which were very clear cuts of 2% *each*. These unilateral changes would have required the signing of or reaffirmation of the restrictive covenants. Presumably the reason Quad declined to do so was because of the adoption of G.L. c. 149 §24L by the Massachusetts legislature which would require Quad to adhere to the provisions of the law. Notably there are financial requirements, but more importantly an employee terminated without cause cannot be held to restrictive covenant.

## Point Two: Quinlan had TJX as a customer prior to his employment with Quad and the Goodwill is Owned by Mr. Quinlan, not Quad.

Prior to his engagement with Quad Mr. Quinlan had a large client, TJX, who he began working with in 1994, a decade prior to his work with Quad. Towards the end of his time with Quad Mr. Quinlan's work consisted of sales to just that one client.

The objective of a reasonable noncompetition agreement is to protect the employer's goodwill, not to appropriate the goodwill of the employee. *See Sentry Ins. v. Firnstein*, 14 Mass. App. Ct. 706, 708 (1982); *Liberty Mut. Ins. Co. v. Batchelor*, 26 Mass. L. Rptr. 446 (Super. Ct. 2009); *Getman v. USI Holdings Corp.*, 19 Mass. L. Rptr. 679 (Super. Ct. 2005); *Invidia, LLC v. Maren DiFonzo*, 2012 WL 5576406 (Mass. Super. Ct. Oct. 22, 2012) (preliminary injunction denied since goodwill may belong to hairdresser, not beauty salon that is former employer). Therefore, the goodwill associated with these customers belongs to the employee and not to the employer. Having brought the goodwill to the employer, the employee is free to leave with it.

## Point Three: The Restrictive Covenant is Aimed to Protect Quad from Ordinary Competition, and Should Be Held as Invalid Pursuant to Public Policy.

The Massachusetts Supreme Court has stated that non-competes are enforceable only to the extent that they are necessary to protect the legitimate business of the employer. Such business interests might include trade secrets, and other confidential information, or the good of the employer, protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced." *Contrast Marine Contrs. Co. v. Hurley*, 365 Mass. 280, 287-288 (1974), see also *Richmond Brother, Inc. v Westinghouse Bdcst. Co.*, 357 Mass. 106, 111.

Quad's 18-month restrictive covenant is aimed to keep their recently terminated sales force from procuring new employment which competes with Quad. Quad is not able to point to any trade secrets, confidential information, or goods which would allow Mr. Quinlan to offer anything more than ordinary competition for the business.

**Point Four:  The Non Competition Agreement Overly Broad and Excessively Ambiguous in it's Actual Application to Mr. Quinlan as a sales employee**

Mr. Quinlan's employment agreement, signed in a stack of papers on his first day of work, offers him a position as Regional Sales Manager. These would be the kinds of services one would expect his restrictive covenants to cover, relating to strategy, trade secrets, and management of regional sales. Instead the restrictive covenant on page 5 of the employment agreement reads "(e) Post Employment Restricted Services Obligation. For 18 months following the end, for whatever reason, of your employment with the Company, you agree not to directly or indirectly provide Restricted Services to any Competitor."

- Restricted Services is defined in a separate portion of the agreement as "The term 'Restricted Services' means duties, functions and services of the kind you provided to the Company during the Reference Period relating to the Business." Business is defined still elsewhere as "custom and/or specialty printing of books, brochures, catalogs, calendars, direct mail, directories, point-of-purchase, displays, in-store signage, fulfillment and print-on-demand services."

- Competitor is defined in the agreement as "any Person that, at the time of your termination competes with the Business, including, but not limited to, Pearl Die-Cutting and Finishing." Person is capitalized but defined.

Even broader is the Employment Letter's "(f) <u>Post Employment Non-Solicitation of</u> <u>Restricted Customers</u>. For 18 Months following the end, for whatever reason of your employment with the Company any goods, products, or services of the type you directly or indirectly sold, marketed, produced or provided during the Reference Period." With Restricted Customer being defined elsewhere in the agreement as "any individual or entity A. for whom/which the Company has provided goods, products, or services and B with whom/which you had direct contact on behalf of the Company or about whom/which you acquired confidential information in connection with your employment by the Company, during your Reference Period."

The confusing cross references and presentment not with the offer letter but on Mr. Quinlan's first day of employment with the demand for instant singing is not commiserate with a full meeting of the minds. Second, the restrictive covenants ban any work done for anyone whom Mr. Quinlan has spoken to on behalf of Quad, or for working for anyone who provides printing services what-so-ever. This overly broad agreements are nothing more than an attempt to ban Mr. Quinlan from the workforce for the duration of his non-compete. What's more is the attempted lock-out is by a publicly traded company with 21,100 employees who apparently afraid Mr. Quinlan, their unceremoniously demoted then terminated salesman will unfairly compete with. The must also contemplate that the current economic environment and Mr. Quinlan's age do not readily lend themselves to beginning and harboring a new career. Instead Quad wanted to cut costs by terminating their staff and want to bench those staff while Quad gorges on the customers they brought to the Company.

## Point Five:  The Restrictive Covenant Violates Public Policy

G.L. c. 149 §24L is effective regarding restrictive covenants entered into in 2018 or later. Regardless of the timeframes involved §24L provides a useful basis as to the current public policy

which would invalidate this agreement. To wit; such agreements are not enforceable against terminated employees. The employer would also need to fund a garden leave clause, provide notice prior to signing and advise to seek counsel, and "must be consonant with public policy."

Public policy as established by the legislature therefore does not favor, or even allow, the kind of abusive actions Quad has engaged in here. They have terminated Mr. Quinlan and informed he cannot work in his chosen field for 18 months. As compensation for this endeavor Quad seeks not to pay him as required under the garden leave provision of the law, but instead to stiff him with even less than his contract calls for.

Public policy favors the right of an employee work in his field. The restrictive covenant is further contrary to the public interest of allowing individuals to freely carry on his or her trade or occupation. Quad is asking the court to order Quinlan to subsidize their apparent inferior marketing ability.

## Point Six: Plaintiff will suffer Irreparable Harm if no injunction is granted, whereas the Defendant will suffer only ordinary competition

Plaintiff seeks an injunction in order to keep working and support himself and his family. Defendants, a publicly traded company with 21,100 employees can weather any resulting storm brought about by Mr. Quinlan. If they contend such a possibility is remote or impossible however they have can seek to limit the injunction on the enforcement of the restrictive covenant to a sane or reasonable level through suggestion to the court now. If they content the harm is truly sever and irreparable, Mr. Quinlan should at least be afforded a his pay while the goliath printing company enjoys use of the client he procured in 1994 and their time in the market unthreatened by Mr. Quinlan's ability to compete with them.

Dated: Monday, August 24, 2020

Respectfully submitted,
Plaintiff
John Quinlan

John Fink BBO 683290
SIMS & SIMS, LLP
53 Arlington Street
Brockton, MA 02301
Tel. (508) 588-6900
Fax (508) 586-3320
E: johnfink@simsandsimsllp.com