UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN QUINLAN,<br><br>      Plaintiff,<br><br>v.<br><br>QUAD/GRAPHICS, INC.,<br><br>      Defendant. | Civil Action No. 1:20-cv-11593-RWZ |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Defendants Quad/Graphics, Inc. ("Quad/Graphics" or the "Company") offers this Opposition to Plaintiff John Quinlan's Motion to Remand, ECF no. 5, 6. The amount in controversy for Plaintiff's claims for "unpaid wages" and injunctive relief range from $90,000 to well over $5,000,000, and therefore far exceeds the $75,000 threshold. Plaintiff offers no evidence to the contrary. The Court should therefore deny Plaintiff's Motion to Remand.

### I. BACKGROUND

Plaintiff was formerly part-owner of UniGraphic, Inc. Shuma Decl. ¶ 5. In February 2014, Quad/Graphics acquired UniGraphic, Inc., and purchased Plaintiff's equity in that entity. Shuma Decl. ¶¶ 6-7. As part of the deal, Quad/Graphics agreed to employ Plaintiff in a sales role. Shuma Decl. ¶ 8. In conjunction with this acquisition and his hire, Plaintiff entered into an Employment Letter Agreement with Quad/Graphics (the "Letter Agreement"). Shuma Decl., Exh. 1. In relevant part, the Letter Agreement contains a noncompetition clause, which states:

> For 18 months following the end, for whatever reason, of your employment with the Company, you agree not to directly or indirectly provide Restricted Services to any

Competitor.[1]

Shuma Decl., Exh. 1, at ¶ 4(e). It also has a customer nonsolicitation clause, which states:

> For 18 months following the end, for whatever reason, of your employment with the Company, you agree not to directly or indirectly sell or attempt to sell to any Restricted Customer any goods, products or services of the type you directly or indirectly sold, marketed, produced or provided during the Reference Period.[2]

Shuma Decl., Exh. 1, at ¶ 4(f). The Letter Agreement also has a severance provision:

> If Quad terminates your employment without Cause at any time after June 30, 2015, then you will receive continued payments of six (6) months' worth of your base salary in approximately equal installments for six (6) months following your termination date paid in accordance with the regular payroll practices of the Company.

Shuma Decl., Exh. 1, at ¶ 3(b)(iv). This severance payment is conditioned on Plaintiff "provid[ing] a release of claims in a form acceptable to the Company within 45 days following your termination of employment and do not revoke such release and only if you comply with the obligations set forth in Section 4 of this agreement." Shuma Decl., Exh. 1, at ¶ 3(b)(vi).

Plaintiff primarily worked with one customer at Quad/Graphics, and that customer's distributor. Shuma Decl. ¶ 10. In working with this customer and its distributor, Plaintiff developed extensive goodwill on behalf of Quad/Graphics. Shuma Decl. ¶ 11. Likewise, Plaintiff learned Quad/Graphics confidential information about the customer and its distributor, including

---

[1] "Restricted Services" are defined as "duties, function and services of kind you provided to the Company during the Reference Period relating to the Business." "Business" is defined as "custom and/or specialty printing of books, brochures, catalogs, calendars, direct mail, directories, point-of-purchase, displays, in-store signage, fulfillment and print-on-demand services. "Competitor" is defined as any person or entity "that, at the time of your termination, competes with the Business." Shuma Decl., Exh. 1, at ¶ 4(a).

[2] "Reference Period" is defined as "the 12 months preceding the end, for whatever reason, of your employment with the Company." "Restricted Customer" means "any individual or entity: (A) for whom/which the Company has provided goods, products or services; and (B) with whom/which you had direct contact on behalf of the Company, or about whom/which you acquired confidential information in connection with your employment by the Company, during the Reference Period." Shuma Decl., Exh. 1, at ¶ 4(a).

specialized pricing, profit margins, and customer preferences. Shuma Decl. ¶ 12. In his last 18 months with Quad/Graphics, Plaintiff had over $5,000,000 in total sales, which yielded over $1,000,000 in profits for Quad/Graphics.[3] Shuma Decl. ¶¶ 13-14. Plaintiff was paid over $500,000 in commissions in this period. Shuma Decl. ¶ 16.

On June 18, 2020, Quad/Graphics terminated Plaintiff. Shuma Decl. ¶ 17. Per the Letter Agreement, Quad/Graphics offered Plaintiff 26 weeks of his base salary in exchange for a release. Plaintiff rejected this offer, and instead demanded his "annualized take home" – that is, his salary plus his commissions – "averaged over the past two years for the duration of a non-compete/non-solicitation agreement as a separation agreement." Melnick Decl., ¶ 4. Plaintiff also stated that he objected to what he called "additional items completed in the separation agreement." Melnick Decl., ¶ 3. On August 5, 2020, Quad/Graphics offered a revised separation agreement, deleting the so-called "additional items" Plaintiff objected to. Melnick Decl. ¶ 5.

Plaintiff did not present a counter-proposal. Melnick Decl. ¶ 6. Instead, on August 24, 2020, Plaintiff filed an action in Superior Court, asserting three claims: Count I, "Injunctive Relief," seeking an injunction "enjoining and restraining Defendants [sic] and their agents, servants, employees and attorneys from (a) seeking to enforce the restrictive covenants in the engagement letter;" Count II, "Failure to Provide Personnel File," seeking "an order directing that the Defendant hand over [Plaintiff's personnel] file, damages as determined by the court, and reasonable attorneys' fees;" and Count III, "Unpaid Wages," seeking "certain benefits to be paid post-employment … treble the money withheld, together with costs and reasonable attorney's fees." *See* Compl. at pp. 2-4. Plaintiff also filed a motion for preliminary injunction in Superior

---

[3] The exact sales volume and margin attributable to Plaintiff are confidential trade secrets of Quad/Graphics. The exact numbers are more than what is stated herein. Shuma Decl. ¶ 15.

3

Court, seeking an injunction against enforcement of the restrictive covenants in the Letter Agreement.[4] On August 25, 2020, Quad/Graphics removed to this Court. This Motion to Remand was filed on August 26, 2020.[5]

## II.    ARGUMENT

### A.    Applicable Legal Standard

Plaintiff does not deny that Quad/Graphics timely removed this matter, that it met the procedural requirements for removal, or that Quad/Graphics and he are entirely diverse. *See* ECF no. 6, at p.3. Rather, the Motion to Remand argues solely that the amount in controversy here does not exceed $75,000. *Id.*

The legal standard for reviewing a motion to remand based on amount in controversy was established by the Supreme Court in 2014, in *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81 (2014). To satisfy the removal statute, initially a defendant is only required to file "a short and plain statement of the grounds for removal" in the notice of removal. 28 U.S.C. § 1446(a). This plain statement "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 574 U.S. at 89. A defendant does not need to include evidentiary support with the notice of removal; rather, "evidence establishing the amount [in controversy] is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation." *Id.* Thus, "when a defendant's assertion of the amount in controversy is challenged" by a motion to remand, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Id.* (citing 29 U.S.C. § 1446(c)(2)(B)).

---

[4] Plaintiff has not filed any motion for preliminary relief in this Court.
[5] Plaintiff did not comply with Local Rule 7.1, as the parties did not meet and confer prior to filing this Motion. Melnick Decl. ¶ 7.

4

The Motion to Remand does not even acknowledge the *Dart Cherokee* standard. Instead, it relies almost entirely on cases that pre-date that decision. These cases have been superseded and should be disregarded. *See Dias v. Genesco, Inc.*, 365 F.Supp.3d 158, 162 (D.Mass. 2019) ("the Supreme Court in *Dart* laid out the new landscape that the Court must traverse in determining the amount in controversy in a removed diversity case"). The Court must therefore consider the evidence offered by each party, then determine whether the amount in controversy is satisfied.

### B. Plaintiff's Motion Should Be Denied Because He Offers No Proof In Support

The Court should deny the Motion to Remand out of hand for the simple reason that Plaintiff <u>offers no evidence at all</u>. While Plaintiff disputes Quad/Graphics' Notice of Removal, under *Dart Cherokee* that is not enough – Plaintiff must come forward with evidence of what he contends the amount in controversy <u>is</u>. Absent any proof from Plaintiff that the amount in controversy is less than $75,000, the Court should deny this Motion. *See Lakeland Reg'l Health Sys. v. Howmedica Osteonics Corp. (In re Stryker LFIT V40 Femoral Head Prods. Liab. Litig.)*, 2020 U.S. Dist. LEXIS 98678, *25 (D.Mass. Jun. 4, 2020) (denying motion to remand under *Dart Cherokee* because the plaintiff did not contest the amount in controversy with evidence).

### C. The Amount in Controversy for Plaintiff's "Unpaid Wages" Claim Exceeds $75,000

In any event, the facts here demonstrate that the amount in controversy requirement is satisfied.[6] In Count III, "Unpaid Wages," Plaintiff seeks "certain benefits" per his Letter Agreement (his severance), "treble the money withheld," and "reasonable attorney's fees" under

---

[6] In a single-plaintiff, single-defendant case, as here, "it is well established that claims can be aggregated to satisfy the jurisdictional amount requirement." *Klepper v. First American Bank*, 916 F.2d 337, 341 (6th Cir. 1990). Quad/Graphics will analyze the Plaintiff's claims separately, but the Court can and should combine the amount in controversy for each claim in determining the total amount.

the Wage Act, M.G.L. c. 149, § 148. Compl., at p.4. These amounts easily exceed $75,000.[7]

In the Civil Action Cover Sheet accompanying his Superior Court filing, Plaintiff wrote, "Unpaid wages – $30,000." *See* ECF no. 1, Exh. A, at p.7. Courts in this District rely on such cover sheets in determining amount in controversy. *See Vilaythong v. Sterling Software, Inc.*, 353 F.Supp.3d 87, 93 (D.Mass. 2018) (noting amount listed "in the civil cover sheet to plaintiff's complaint," and denying motion to remand); *Williams v. Toys "R" Us – Del., Inc.*, 2016 WL 5723588, *2 (D.Mass. Sep. 28, 2016) (same); *cf. Toro v. CSX Intermodal Terminals, Inc.*, 199 F.Supp.3d 320, 324 (D.Mass. 2016) (relying on civil action cover sheet and finding amount in controversy was sufficient, but remanding on other grounds).[8] Thus the "unpaid wages" at issue in this case are at least $30,000.

It is unclear how Plaintiff calculated this $30,000 amount; regardless, the facts show the "unpaid wages" sought by Count III are $48,750. The "certain benefits to be paid post-employment" sought by this claim are the "six (6) months' worth of [Plaintiff's] base salary" under the Letter Agreement. Shuma Decl., Exh. 1, at ¶ 3(b)(iv). At the time of his separation, Plaintiff's annual base salary was $97,500. Shuma Decl. ¶ 18. Thus, six months of his base salary equals $48,750 – the "unpaid wages" at issue here.

Regardless of whether the unpaid wages are $30,000 or $48,750, under the Wage Act, any damages are automatically and mandatorily trebled. M.G.L. c. 149, § 150; *see Rosnov v. Molloy*, 460 Mass. 474, 479 (2011); *see also* Compl. Count III ("Wherefore" clause requesting "relief

---

[7] Quad/Graphics denies that Plaintiff is entitled to any recovery, under the Wage Act or otherwise, and assumes Plaintiff's potential damages for purposes of this Motion only.
[8] The Motion to Remand states, "the Civil Action Cover Sheet is not a pleading and not admissible as a pleading" (ECF no. 6, at 4), but offers no authority in support of this assertion.

under the Wage Act of treble the money withheld"). [9] Such mandatory treble damages are included as part of the amount in controversy. *See Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67, 82 (1st Cir. 2014) (calculating amount in controversy by "multiplying [damages] … by three for treble damages" under the Wage Act); *Vilaythong*, 353 F.Supp.3d at 93 (same); *cf. Toro*, 199 F.Supp.3d at 322 ("the amount in controversy includes statutory multipliers of damages"). In short, the potential damages for Count III are either $30,000 x 3 = $90,000, or $48,750 x 3 = $146,250.

Quad/Graphics further notes that the Court may consider potential attorneys' fees in calculating the amount in controversy. *Spielman v. Genzyme Corp.*, 251 F.3d 1, 7 (1st Cir. 2001) (attorney's fees may be included in "the amount-in-controversy determination … when a statute mandates or allows payment of the fees"); *cf. Toro*, 199 F.Supp.3d at 323 ("The amount in controversy includes … statutory attorney's fees"). This includes prospective fees during the course of the litigation. *See Fritsch v. Swift Transportation Company of Arizona, LLC,* 899 F.3d 785, 794 (9th Cir. 2018) ("future attorneys' fees … should be included in the amount in controversy"); *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013) (holding that removal was proper when it was "more likely than not that the attorney's fees likely to be incurred by Appellants … will exceed the jurisdictional threshold"); *Grant v. Chevron Phillips Chem. Co.*, 309 F.3d 864, 876 (5th Cir. 2002) (holding that court had authority to "include the potential attorney's fees award in calculating the amount in controversy"). Since Plaintiff filed two motions in just the first week of this matter, it is apparent that this case will be hotly litigated, and therefore Plaintiff's potential attorney's fees will be substantial – possibly more than $75,000 themselves. The amount

---

[9] Given that Plaintiff explicitly seeks treble damages, the assertions in the Motion to Remand that Quad/Graphics "speculates in the Notice of Removal that the figure is subject to trebling," or "stranger still, Defendant then multiplied that number by the number by three" (ECF no. 6, at 4) are inexplicable.

7

in controversy for Count III therefore exceeds $75,000, and removal was proper.

### D. The Amount in Controversy for Injunctive Relief Exceeds $75,000

Additionally, the value of the injunctive relief sought here also exceeds the amount-in-controversy threshold. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). That is, when a plaintiff seeks injunctive relief, the value of the matter in controversy is measured "by the judgment's pecuniary consequences to those involved in the litigation." *Richard C. Young & Co. v. Leventhal*, 389 F.3d 1, 3 (1st Cir. 2004); *see Herbert H. Landy Ins. Agency, Inc. v. Navigators Mgmt. Co.*, 2014 U.S. Dist. LEXIS 112994 (D.Mass. Aug. 8, 2014) (same). Courts measure this from either the perspective of the plaintiff or of the defendant. *See Muscarello v. Ogle County Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006); *Smith v. Washington,* 593 F.2d 1097, 1099 (D.C. Cir. 1978); *Concepcion-Navedo v. Putnam LAC Holding, LLC*, 212 F.Supp.3d 297, 298-99 (D.P.R. 2015) ("The amount in controversy, therefore, must be measured also taking into account the cost to defendants in complying with the proposed injunctive relief").

From either Plaintiff's perspective or Quad/Graphics' perspective, the value of the injunction sought – invalidating the noncompetition and nonsolicitation clauses in the Letter Agreement – is worth far more than $75,000.[10] Starting with Plaintiff's perspective, "the value of this claim … is best approximated by the amount [Plaintiff] stands to lose if the [Letter Agreement] is enforced." *Kurra v. Synergy Computer Solutions, Inc.*, 2016 U.S. Dist. LEXIS 127248, *12 (D.Mass. Sept. 19, 2016). Plaintiff contends that he "is unable to pursue employment in his field

---

[10] Quad/Graphics denies that Plaintiff is entitled to any injunctive relief.

8

while the Defendant's [sic] assert such claims" under the restrictive covenants. Compl. ¶ 25. Thus, the potential loss to Plaintiff is his projected pay at a new job with a competitor for the restricted period, 18 months. *See Kurra*, 2016 U.S. Dist. LEXIS 127248, at *13 (calculating amount in controversy as the value of the salary employee would earn at new job). Here, assuming Plaintiff could obtain a job paying roughly the same as he made at Quad/Graphics ($97,500 base salary), over an 18 month period, that means the amount in controversy here is $146,250. Further, if we assume that Plaintiff could obtain a job paying salary plus commissions (as he had at Quad/Graphics), the amount in controversy would be over $500,000.[11] This amount exceeds the $75,000 threshold. *See Kurra*, 2016 U.S. Dist. LEXIS 127248, at *13 (denying motion to remand).

From the perspective of Quad/Graphics, the amount in controversy is "the profits earned by the employer on business generated by the employee during the period immediately preceding his termination." *Milwaukee Mailing, Shipment & Equip., Inc. v. Neopost, Inc.*, 259 F.Supp.2d 769, 772 (E.D. Wis. 2003) (quoting 14B Charles Alan Wright, et al., Federal Practice and Procedure § 3798 (3d ed. 1998)); *see Luna v. Kemira Specialty, Inc.*, 575 F.Supp.2d 1166, 1172 (C.D. Cal. 2008) (same). Courts also consider the "revenues generated by an employee and the revenues lost by the employer in determining whether the jurisdictional minimum has been met." *Luna*, 575 F.Supp.2d at 1172; *see Basicomputer Corp. v. Scott*, 973 F.2d 507, 510 (6th Cir. 1992) (finding amount in controversy requirement met because employees "generated sales worth well over $100,000 per year"); *USAchem, Inc. v. Goldstein*, 512 F.2d 163, 170 (2d Cir. 1975) (relying on "volume of sales involved"); *Info. Strategies, Inc. v. Dumosch*, 13 F.Supp.3d 135, 142 (D.D.C. 2014) (looking to "revenue generated" by employee). While "the value of an injunction may not

---

[11] Notably, in seeking to settle this dispute, Plaintiff asked for his compensation for the duration of the restricted period, demonstrating the value he places on this matter. Melnick Decl. ¶ 4.

be capable of precise determination, [] precision is not required." *Luna*, 575 F.Supp.2d at 1172. Further, "courts measure an employer's future loss based on the employee's past performance." *Milwaukee Mailing*, 259 F.Supp.2d at 774.

In the 18 months before his separation, Plaintiff generated sales of over $5,000,000, which yielded profits of over $1,000,000. Quad/Graphics would stand to lose that if Plaintiff was able to work unfettered for a competitor during the period he would otherwise be restricted under the Letter Agreement. The amount in controversy is satisfied under this perspective as well. *See Info. Strategies*, 13 F.Supp.3d at 142 (finding amount in controversy satisfied based on revenues generated by employee); *Luna*, 575 F.Supp.2d at 1173 (same); *Absolute Machine Tools, Inc. v. Clancy Machine Tools, Inc.*, 410 F.Supp.2d 665, 670 (N.D. Ohio 2005) (same).

"Federal courts have not had difficulty finding the requisite jurisdictional amount in actions brought to enforce covenants not to compete." *Info. Strategies*, 13 F.Supp.3d at 142 (quoting *Premier Indus. Corp. v. Tex. Indus. Fastener Co.*, 450 F.2d 444, 446 (5th Cir. 1971)). So too here. Because the value of Plaintiff's claim for injunctive relief far exceeds $75,000, whether viewed from Plaintiff's perspective or Quad/Graphics', the amount in controversy is satisfied.[12]

## III. CONCLUSION

For the foregoing reasons, the case was properly removed and this Court should deny Plaintiff's Motion to Remand.[13]

---

[12] Quad/Graphics concedes that the amount in controversy for Count II, "Failure to Provide Personnel File," is nominal. There is no basis for seeking "damages" or "attorney's fees" under the personnel record statute, M.G.L. c. 149, § 52C.

[13] Because the Motion to Remand should be denied, and because Quad/Graphics was justified in removing this matter, Plaintiff's request for attorney's fees and costs should also be denied.

Respectfully submitted,

QUAD/GRAPHICS, INC.

By its attorneys,

/s/ Stephen T. Melnick
Stephen T. Melnick (BBO No. 667323)
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110
(617) 378-6000 (t)
(617) 737-0052 (f)
smelnick@littler.com

September 9, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September 2020, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ Stephen Melnick
Stephen Melnick