EMPLOYMENT LETTER AGREEMENT

February 5, 2014

John V. Quinlan
55 Cedar Street
Apt. 2309
Woburn, MA  01801

Dear Jack:

      This letter agreement sets forth the terms and conditions of your employment by Quad/Graphics, Inc.("Quad" or the "Company") as a result of the closing of Quad's acquisition of UniGraphic, Inc. This letter agreement will become effective only if the closing occurs.

    1.    <u>Employment</u>. You will be employed in the position of Regional Sales Manager, Commercial and Specialty. You will report initially to Bob Quinlan, Sales Director, Commercial and Specialty. You must devote your full business time, attention, skill and best efforts to the business and affairs of Quad. You will have such duties, responsibility and requisite authority as are reasonably assigned to you from time to time by Monti or senior management.

    2.    <u>Compensation and Benefits</u>.

    (a) <u>Base Salary</u>. You will receive an annual base salary of $125,000 ("Base Salary"), to be prorated for 2014. Your Base Salary will be paid in equal weekly installments or in accordance with Quad's regular payroll practices as in effect from time to time.

    (b) <u>Sales Bonus 2014 and 2015</u>. You will be eligible to receive a sales bonus for the time period March 1, 2014 – February 28, 2015 ("2014 Bonus Year") and March 1, 2015 – February 29, 2016 ("2015 Bonus Year"). For purposes of the 2014 Sales Bonus ("2014 Sales Bonus"), should UniGraphic achieve a Total Revenue of $50 Million in the 2014 Bonus Year (as "Total Revenue" is defined by the Stock Purchase Agreement between Quad, you, and others), you will be eligible for a bonus of 25% of your 2014 Base Salary. If UniGraphic's Total Revenue exceeds $50 Million by 5% or more for the 2014 Bonus Year, you will be eligible to receive a total bonus of 50% of your 2014 Base Salary. To be eligible for this sales bonus you must remain in continuous full-time employment in good standing with the Company until the 2014 Sales Bonus is paid, which date shall be on or before May 15, 2015.

    For purposes of the 2015 Sales Bonus ("2015 Sales Bonus"), should UniGraphic achieve a Total Revenue of $53 Million in the 2015 Bonus Year, you will be eligible for a bonus of 15% of your 2015 Base Salary. If UniGraphic's Total Revenue exceeds $53 Million by 5% or more for the 2015 Bonus Year, you will be eligible to receive a total bonus of 30% of your 2015 Base Salary. To be eligible for this sales bonus you must remain in continuous full-time employment in good standing with the Company until the 2015 Sales Bonus is paid, which date shall be on or before May 15, 2016.

4811-5274-93351

This Sales Bonus will apply for the time periods set forth above only unless otherwise mutually agreed to in writing.

(c) Draw Against Commissions. For calendar years 2014 and 2015 only, you will receive a guaranteed draw against commissions in the amount of $70,000, to be prorated for 2014. Earned commissions will be offset against this draw up to $70,000 in each such year.

(d) Equity. In calendar year 2014, you shall receive a grant of restricted stock in accordance with the 2014 Restricted Stock Award document and pursuant to the terms of that document and the applicable plan and plan document(s). Your grant shall be that number of shares which, at the time of the grant according to the approved fair market valuation methodology, would have a value of $75,000.

In calendar year 2015, you shall receive a grant of restricted stock in accordance with the 2015 Restricted Stock Award document and pursuant to the terms of that document and the applicable plan and plan document(s). Your grant shall be that number of shares which, at the time of the grant according to the approved fair market valuation methodology, would have a value of $60,000.

(e) Vacation. You will be granted four (4) weeks of vacation each year until an increase would be otherwise allotted according to the Quad Employee Guidelines.

(f) Other Benefits. You will be entitled to participate in the benefits arrangements provided by the Company to its similarly-situated employees at your location, as described in the Quad Employee Guidelines, and subject to the terms and conditions of such plans or other benefits arrangements, as amended from time to time, and to your meeting the eligibility requirements for such arrangements.

(g) Tax Withholding. Quad will deduct from the payments to be made to you under this agreement any federal, state or local income and employment tax withholding or other taxes or charges which it is from time to time required to deduct under applicable law with respect to such payments or any other benefits provided hereunder, and all amounts or percentages payable to you under this agreement are stated before any such deduction.

3. Termination of Employment.

(a) At-Will Employment. You acknowledge and agree that, notwithstanding anything to the contrary in this agreement, you are employed at will. This agreement is not intended and should not be construed as a contract for any term of employment. By signing this agreement, you acknowledge that your employment, compensation and benefits may change from time to time and are for no definite period of time. The Company may terminate your employment and this agreement, at any time, with or without Cause (as defined below), without further obligation on the part of the Company, except as provided in Section 3(b), or you may resign from employment without further obligation under this agreement, except as provided in Section 4.

(b) Payment on Termination.

(i) Notwithstanding anything in this Agreement, if Quad terminates your employment without Cause at any time prior to or on June 30, 2015, then you shall receive

any unpaid 2014 Base Salary (prorated solely to account for Start Date) and any unpaid 2015 Base Salary, paid in accordance with the above provisions of this Agreement.

(ii)    In addition to (i) above, notwithstanding anything in this Agreement, if Quad terminates your employment without Cause at any time prior to or on May 15, 2016, then you shall receive any unpaid 2014 Sales Bonus (at 25% of full 2014 Base Salary) and any unpaid 2015 Sales Bonus (at 15% of 2015 Base Salary). The only exceptions to this paragraph are as follows and to the extent a Sales Bonus is unpaid at the time of termination: (A) if you worked through February 28, 2015 or February 29, 2016 and UniGraphic did not achieve Total Revenue required for the 2014 Bonus Year or the 2015 Bonus Year, respectively, in which case the applicable Sales Bonus will not be paid; and (B) if you worked through February 28, 2015 and UniGraphic's Total Revenue exceeds $50 Million by 5% or more in the 2014 Bonus Year, in which case you will be paid a total bonus of 50% of your Base Salary for the 2014 Bonus Year; and (C) if you worked through February 29, 2016 and UniGraphic's Total Revenue exceeds $53 Million by 5% or more in the 2015 Bonus Year, in which case you will be paid a total bonus of 30% of your Base Salary for the 2015 Bonus Year.

(iii)   In addition to (i) and (ii) above, notwithstanding anything in this Agreement, if Quad terminates your employment without Cause at any time prior to or on March 15, 2016, then you shall receive any unpaid 2014 and 2015 Draws Against Commissions as set forth in section 2(c) and prorated for 2014 solely to account for start date.

(iv)    If Quad terminates your employment without Cause at any time after June 30, 2015, then you will receive continued payments of six (6) months' worth of your base salary in approximately equal installments for six (6) months following your termination date paid in accordance with the regular payroll practices of the Company.

(v)     If Quad terminates your employment without Cause at any time, and if either of the equity grants described in 2(d) above have not vested at the time of your termination, you will be paid $75,000 for the 2014 grant and/or $60,000 for the 2015 grant in a lump sum in place of such unvested equity.

(vi)    You will be entitled to the payments under (i)-(v) above only if you provide a release of claims in a form acceptable to the Company within 45 days following your termination of employment and do not revoke such release and only if you comply with the obligations set forth in Section 4 of this agreement. If Quad terminates your employment without Cause but subsequently determines that your employment could have been terminated for Cause, then (without limitation of other remedies) no further such payments will be made. For purposes hereof, "Cause" means your (i) commission of a felony involving dishonesty or fraud with respect to the Company, (ii) material failure to perform duties (other than as a result of your disability) of the position held by you as directed by the senior management of the Company, (iii) willful misconduct with respect to the Company, or (iv) any material breach by you of the terms of this agreement or any other agreement with the Company. For the avoidance of doubt, the termination of your employment as a result or your death or disability will not be considered a termination without Cause.

4.    Covenants. In consideration of the promises made by the Company hereunder, you agree to each the following:

3

(a) <u>Definitions</u>.

(i) <u>Business</u>. The term "Business" means custom and/or specialty printing of books, brochures, catalogs, calendars, direct mail, directories, point-of-purchase, displays, in-store signage, fulfillment and print-on-demand services.

(ii) <u>Business Ideas</u>. The term "Business Ideas" means all ideas, inventions, data, software, developments and copyrightable works, whether or not patentable or registrable, which you originate, discover or develop, either alone or jointly with others while you are employed by the Company entity and for 12 months thereafter and which are (A) related to any business known by you to be engaged in or contemplated by the Company, (B) originated, discovered or developed during your working hours or (C) originated, discovered or developed in whole or in part using materials, labor, facilities, Confidential Information, Trade Secrets, or equipment furnished by the Company.

(iii) <u>Competitor</u>. The term "Competitor" means any Person that, at the time of your termination, competes with the Business, including, but not limited to, Pearl Die-Cutting and Finishing.

(iv) <u>Confidential Information</u>. The term "Confidential Information" means all non-Trade Secret information of, about or related to the Company or provided to the Company by its customers that is not known generally to the public or the Company's competitors. Confidential Information includes, but is not limited to: (A) inventions, product methodologies and specifications, information about goods, products or services under development, research, development or business plans, procedures, survey results, pricing or other financial information, confidential reports, handbooks, customer lists and contact information, information about orders from and transactions with customers, sales, marketing and acquisition strategies and plans, pricing strategies, information relating to sources of data used in goods, products and services, computer programs, computer system documentation, production manuals, operations books, educational materials, audio, visual or electronic recordings, customer communications, customer contracts, training materials, personnel information, business records, or any other materials or technical methods/processes developed, owned or controlled by the Company; (B) information and materials provided by a customer or acquired from a customer; and (C) information marked or otherwise designated or treated as confidential or proprietary by the Company. The fact that the Company has not labeled a document or other material "Confidential" shall not be deemed a waiver of its right to claim that said document or material is Confidential Information.

(v) <u>Reference Period</u>. The term "Reference Period" means the 12 months preceding the end, for whatever reason, of your employment with the Company.

(vi) <u>Restricted Customer</u>. The term "Restricted Customer" means any individual or entity: (A) for whom/which the Company has provided goods, products or services; and (B) with whom/which you had direct contact on behalf of the Company, or about whom/which you acquired confidential information in connection with your employment by the Company, during the Reference Period.

**QUAD 004**

      (vii) <u>Restricted Services</u>. The term "Restricted Services" means duties, functions and services of the kind you provided to the Company during the Reference Period relating to the Business.

      (viii) <u>Trade Secret</u>. The term "Trade Secret" has the meaning set forth under applicable law.

    (b) <u>Confidentiality</u>. During the term of your employment, you will not directly or indirectly use or disclose any Confidential Information or Trade Secret of the Company except in the interest and for the benefit of the Company. After the end, for whatever reason, of your employment with the Company, you will not directly or indirectly use or disclose any Trade Secret of the Company. For a period of 24 months following the end, for whatever reason, of your employment with the Company, you will not directly or indirectly use or disclose any Confidential Information. Notwithstanding the foregoing, (i) the terms "Trade Secret" and "Confidential Information" do not include, and the obligations set forth in this agreement do not apply to, any information which (A) is or becomes generally available to the public through no act or omission of yours or (B) is independently developed by you outside the scope of your employment without use of Confidential Information or Trade Secrets; and (ii) you may disclose Confidential Information or Trade Secrets at such times, in such manner and to the extent such disclosure is required by applicable law, provided that you (1) provide the Company with prior written notice thereof, (2) limit such disclosure to what is strictly required and (3) attempt to preserve the confidentiality of any Confidential Information or Trade Secrets so disclosed.

    (c) <u>Assignment of Business Ideas</u>. You represent that you do not personally own an interest in any inventions, patents, applications for patent, copyrights, and applications for copyright. The Company will own, and you hereby assign to the Company, all rights in all Business Ideas. All Business Ideas which are or form the basis for copyrightable works shall be considered "works for hire" as that term is defined by U.S. Copyright Law. Any works that are not found to be "works for hire" are hereby assigned to the Company. While employed by the Company and thereafter, you will promptly disclose all Business Ideas to the Company and execute all documents which the Company may reasonably require to perfect its patent, copyright and other rights to such Business Ideas throughout the world. After your employment with the Company terminates, for whatever reason, you will cooperate with the Company to assist the Company in perfecting its rights to any Business Ideas including executing all documents which are required in order to perfect such rights.

    (d) <u>Restrictions on Competition During Employment</u>. During the term of your employment with the Company, you will not (i) directly or indirectly compete against the Company, or directly or indirectly divert or attempt to divert customers' business from the Company anywhere the Company does business, including but not limited to acting in any manner on behalf of or for the benefit of Pearl Die-Cutting and Finishing, or increasing your ownership interest in Pearl Die-Cutting and Finishing; or (ii) engage in any related party transactions (including with Pearl Die-Cutting and Finishing) without prior approval from the President of Commercial & Specialty or the Director of Purchasing of the Company. .

    (e) <u>Post-Employment Restricted Services Obligation</u>. For 18 months following the end, for whatever reason, of your employment with the Company, you agree not to directly or indirectly provide Restricted Services to any Competitor.

QUAD 005

(f) <u>Post-Employment Non-Solicitation of Restricted Customers</u>. For 18 months following the end, for whatever reason, of your employment with the Company, you agree not to directly or indirectly sell or attempt to sell to any Restricted Customer any goods, products or services of the type you directly or indirectly sold, marketed, produced or provided during the Reference Period.

(g) <u>Post-Employment Non-Solicitation of Employees</u>. During the term of your employment with the Company and for 18 months thereafter, you shall not directly or indirectly encourage any Company employee to terminate or diminish their employment with the Company.

(h) <u>Acknowledgement</u>. You acknowledge and agree that the Company does business and sells and distributes its goods, products and services throughout the United States and, that, given the nature of the business of the Company and your role with the Company, the duration, geographic scope and activity restrictions of this Section 4 are reasonable and will not prevent you from earning a living.

(i) <u>Survival</u>. The covenants set forth in this Section 4 shall survive the termination, for whatever reason, of your employment hereunder.

5. <u>Miscellaneous</u>.

(a) <u>Benefits and Obligations</u>. This agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by the Company and its successors and assigns, and you, your heirs, assigns or legal representatives, provided that your obligations contained herein may not be delegated or assigned.

(b) <u>Offset</u>. The Company shall have the right to offset from the amounts payable to you hereunder any amount that you owe to the Company without obtaining your consent at such time (or following your death, the consent of your spouse or personal representative of your estate).

(c) <u>Specific Performance</u>. In the event of any controversy concerning the rights or obligations under this agreement, such rights or obligations will be enforceable in a court of equity by a decree of specific performance. Such remedy, however, will be cumulative and nonexclusive and will be in addition to any other remedy to which the parties may be entitled. You shall pay the Company's costs of enforcing any of the provisions of Section 4, including reasonable attorneys' fees.

(d) <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, void, or unenforceable to any extent, such term or provision shall be construed so as to give it the maximum effect permitted by law. Should any provision, or any part of any provision, of this Agreement be held to be invalid or unenforceable, such validity or unenforceability shall not affect the validity or enforceability of any other provisions or other part of such provision, or of such provisions or part thereof.

(e) <u>Waiver</u>. The failure of any party hereto to insist, in any one or more instances, upon performance of any of the terms and conditions of this letter, shall not be construed as a waiver or relinquishment of any right granted hereunder or of the future performance of any such term, covenant or condition.

QUAD 006

(f) <u>Governing Laws</u>. This agreement shall be governed by and construed in accordance with the laws of the State of Massachusetts, without reference to the conflict of law principles thereof.

(g) <u>Venue</u>. Milwaukee County, WI shall be the exclusive venue for disputes arising under this agreement, and the parties consent to the exclusive jurisdiction and proper venue of, any state or federal court located in Milwaukee County, Wisconsin.

(h) <u>Subsequent Employment</u>. You agree that the Company may notify any other employer you may have or any other third party about your obligations under this agreement until such time as you have performed all of your obligations hereunder. Upon the Company's request, you agree to provide the Company with information, including, but not limited to, supply details of your subsequent employment, sufficient to verify that you have not or are not breaching any covenant of this agreement.

(i) <u>Entire Agreement</u>. This agreement supersedes all prior agreements between the parties (including any agreement with UniGraphic prior to the Company's acquisition of UniGraphic) and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. In addition, you acknowledge that any previous employment agreements with UniGraphic were terminated prior to entering this Agreement and that no additional amounts are owed to you thereunder.

(j) <u>Voluntary Agreement</u>. You acknowledge and agree that you have carefully read this agreement, understand it contents, have been given the opportunity to ask any questions concerning the letter and its contents, and have agreed to the terms and conditions hereof as your free and voluntary act.

Sincerely,

QUAD/GRAPHICS, INC.

BY *(signature)*

Please sign below to signify your understanding and acceptance of the terms and conditions of this agreement, including your agreement to be bound by the provisions of Section 4.

*(signature)*
John V. Quinlan
Date: 2/5/14

7

**QUAD 007**